**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| | **)** | |
| **v.** | **)** | **Case No. 22-cr-00027-RMM** |
| | **)** | |
| **TYLER TEW** | **)** | |
| | **)** | |
| | **)** | |
| **Defendant** | **)** | |
| | **)** | |

**DEFENDANT TYLER TEW'S SENTENCING STATEMENT**

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com
*Attorney for Defendant*

I.    <u>Introduction</u>

Comes now Defendant Tyler Tew by and through his undersigned counsel of record, William L. Shipley Esq., and submits to this Court his Sentencing Statement in advance of the Sentencing Hearing on October 12, 2023.

Defendant Tew appears for sentencing before this Court having pled guilty to Counts One through Four of the Indictment, charging him with a violation of 18 U.S.C. 1752(a)(1); Temporary Residence Of The President; Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. 1752(a)(2); Temporary Residence Of The President; Disorderly and Disruptive Conduct in a Restricted Building or Grounds, 40 U.S.C. 5104(e)(2)(D); Violent Entry And Disorderly Conduct On Capitol Grounds; Disorderly Conduct in a Capitol Building, and 40 U.S.C. 5104(e)(2)(G); Violent Entry And Disorderly Conduct On Capitol Grounds; Parading, Demonstrating, or Picketing in a Capitol Building.

Defendants face a statutory maximum penalty of up to 12 months imprisonment and a fine up to $100,000.

Mr. Tew has no prior criminal history.  The Presentence Report determines that the Guideline Range is 0-6 months.  The Probation Officer has recommended a sentence of 36 months of probation, and a fine.

Mr. Tew concurs with the recommendation in all respects except one – Mr. Tew believe a term of probation of 24 months is sufficient to meet all the goals of sentencing set forth in Sec. 3553a.

II.    <u>Sentencing Guidelines Calculation</u>

Defendant and the Government did not enter into a plea agreement. Rather, Defendant Tew plead to all charges of the information.  Mr. Tew accepted responsibility for his conduct and was willing to admit to facts sufficient to establish his guilt as to each count charged.  Mr. Tew was not willing to accept or admit a factual basis drafted by the Government given what he knew about factual admissions forced on other defendants through government crafted plea agreements.

Violations of 18 U.S.C. Sections 1752(a)(1) and (2) are both a Class A misdemeanor, with a maximum term of imprisonment of up to 12 months.

Violation of 40 U.S.C. Sections 5104(e)(2)(D) and 40 U.S.C. 5104(e)(2)(G) are Class B misdemeanors, with a maximum term of imprisonment of up to 6 months.

The Guideline Calculation of the Presentence Report

**Base Offense Level:**                                                    **10**
    Specific Offense Characteristics:                          0
    Victim Related Adjustment:                                 0
    Adjustment for Role in the Offense:                        0
    Adjustment for Obstruction of Justice:                     0

Adjusted Offense Level **(Subtotal):**                                **10**

Chapter Four Enhancement:                                              0

Acceptance of Responsibility:                                         -2

**Total Offense Level:**                                               **8**

Based on an offense level of 8, and a criminal history score of 1, the Recommended Guideline Range is 0 -- 6 months.

   III.   <u>The Offense Conduct</u>.

The Probation Officer has accurately set forth the relevant facts in the Presentence Report.

IV.     <u>Sentencing Factors Under Sec. 3553(a)</u>

Pursuant to 18 U.S.C. § 3553(a), several factors are to be considered by the Court in formulating an appropriate sentence in this case.

1.     Nature and circumstances of the offense and the history and <u>personal characteristics of the defendant</u>.

a. <u>The Nature and Circumstances of the Offense</u>.

For the most part, the events of the day on January 6 are not in dispute and need not be recounted here.  As Judges in this District have recognized after studying the events of January 6 in great detail, the crowd at the Capitol that day can be generally categorized as having three primary constituent parts:

1)  A relatively small group of individuals who came to the Capitol for the purpose and with the intent to engage in violence with the goal of disrupting the Congress's certification of the 2020 Electoral Vote.

2)  A larger number of protesters who intended to protest in a loud and raucous manner as a manifestation of their unhappiness and distrust with regard to the outcome of the election -- but with no predetermined intention of engaging in violence – some of whom were drawn into committing acts of violence once there; and

3) an even larger group who remained as spectators to what developed into a riot by members of the first two groups.  Some members of this third group entered the Capitol building, walked around, and then exited without incident.

As for Defendant Tew, his actions and the events of the offense as described in the Presentence Report, to which he has admitted, place him squarely in the third group. Defendant Tew traveled to Washington, D.C. to attend the "Stop the Steal" rally in support of then President Donald Trump. He attended the rally as a way to express his concerns regarding what he believed were the irregularities of the 2020 presidential election.

Mr. Tew does not hide from the fact that he was vocal in expressing his views about voting irregularities that he believed called into question the accuracy of the reported outcomes in several states. He communicated his views to friends online about what they should do, as citizens, if they felt passionately – as he did -- and wanted their voices heard. He discussed with them the right to peaceably assemble and to petition the Government for a redress of grievances.

He and friends discussed their understanding that a large group of people from throughout the country were planning to gather in Washington D.C. in January to protest the irregularities in the 2020 election. He did not plan to attend himself until a friend from Idaho said he was chartering a private plane for a trip to Washington. He told Mr. Tew that there would be extra space available for Mr. Tew in their hotel room if he wanted to sleep on the floor.

Since Mr. Tew was a commercial airline pilot at the time, he had the ability to fly on any airline in the U.S. for free, using the extra "jump-seat" in the cockpit. "Jump-seat" flying by pilots not assigned to a flight is a permissible FAA practice that improves safety through having an additional

pilot on the flight in case one of the pilots had become incapacitated or the crew needed additional help in the event of an emergency. Mr. Tew was between scheduled flights with his employer and at the last minute decided to fly "jump seat" to D.C. and meet his friend from Idaho.

Mr. Tew flew into Washington D.C. on the evening of January 5 and went to the Capitol building.  He met up with his friend and did a short sightseeing tour of the surrounding area.  Crowds of people who had come for the rally the next day were already gathering at various locations around D.C. on the evening of January 5.  Mr. Tew went to the Trump Hotel with his friend who had a special invitation.  Members of Congress, Don Trump Jr., and a few high-ranking officials of the Trump Administration gathered with the invited guests to talk about what might possibly happen the next day during the Congressional certification hearing.   Members of the public asked questions to the members of Congress such as, "Do you think Mike Pence will de-certify the election tomorrow?" and other similar inquiries.  That was the main point of the discussion – what legally grounds were available to the GOP members of Congress the following day to delay the certification of the 2020 election and petition the federal Government to do something to investigate the allegations of irregularities at the state level.  Mr. Tew and his friend left the Trump Hotel, drove to their hotel, had a meal, and called it a night.

Mr. Tew's friend was able to get them VIP passes for the January 6 rally to watch the speech by former President Trump from the 5th or 6th row.  After the speech Mr. Tew stood in line for approximately 30 minutes waiting to use the temporary bathroom facilities that had been installed for the event. By the

time he returned to his friend, most of the crowd had already started walking towards the Capitol, so they followed.  They arrived at the Capitol close to 2:00 pm.  By the time they arrived, tens of thousands of other protesters were already there ahead of them.  Not long after they arrived, the entire crowd moved in the direction of the Capitol building across the grassy area, but that was a very congested path.

Both to his left and to his right Mr. Tew could see the crowd moving forward towards two different sets of steps that appeared to lead to the Capitol building.  He observed no fences or other barriers as we walked near the rear of the crowd.  He did see what looked like gates or racks stacked on top of each other in a grassy area, but he didn't associate those items with any use as a barrier of any kind.  There were no police officers or anyone who looked to be a government official in any direction as he walked forward at the back of the crowd.  Eventually he was surrounded by protesters on all sides, and the only people he could see clearly were people who had made it to the stop of the stairs and were waving for the crowd to continue forward. He had no knowledge as to what was happening at the exterior of the Capitol or inside the building as he started up the stairs.  But he decided to change course and follow a line of individuals who opted to not go up the stairs on the right or left side, and instead took what looked like a set of stairs closer to the middle that seemed to be temporary or under construction.

From the elevated vantage point at the top of the stairs he observed the huge crowd on the West Side as they chanted "U.S.A, U.S.A, U.S.A." The large majority of people appeared to be normal citizens walking around in normal

clothes who were doing nothing more than peacefully assembling and protesting. There were others, however, wearing gas masks, riot gear such as helmets and vests, and with backpacks full of various types of items, including bear spray and pepper spray.

He stood outside for a time and watched as members of the crowd entered the Capitol through a set of doors, and at the same time others exited the Capitol through the same set of doors. Some of those coming out had been in some type of confrontation with law enforcement as they seemed to be suffering from having been pepper sprayed. Others who exited the building came out looking like nothing happened and they had just been doing some sightseeing.

After spending some time watching, Mr. Tew approached the same doors and made the unwise judgment to enter the Capitol himself. Mr. Tew used his phone to video record pretty much everything he did while inside. Up to this point, the only law enforcement officers he had seen were on the far side of the building -- to the right of where he arrived. They were wearing riot gear and standing in a line as if they were making sure nobody went beyond where they were on that side of the building.

Once inside Mr. Tew observed 2 or 3 police officers standing in a hallway to his right. They appeared to be blocking a hallway where they were standing, and Mr. Tew did not see any protester go down that hallway. One person did try to run past them but was stopped and tackled by the officers. He watched the event, and then one of the officers pointed him to go in a specific direction further inside the capital. He took from that encounter that remaining inside

the building was allowed because they did not point in the direction of leaving nor tell him to leave.

As he continued further into the capital, he once again observed 2--3 more law enforcement officers blocking a hallway directing protesters to continue down a different hallway.  He again took from their directions that remaining in the building was allowed so long as he continued to follow directions.  As he continued down the hallway he turned to the right in a direction he had not been.  At the end of that hallway there were law enforcement officers dressed in riot gear.  He turned around and started to go back in the direction from which he had come before he got to them. But as he did so officers started shooting pepper ball munitions above their heads. As he and others inside tried to exit the building, they were met with more people outside who were trying to come inside.

After exiting, Mr. Tew did not attempt to reenter the capital. He did remain on the grounds near the steps and continued to participate in the protest. He did observe one person pick up a rock and throw it at a window and watched in amazement as about 4 or 5 other people yelled "This is OUR house, we don't vandalize OUR house."

He continued around the corner and observed a group of protesters arguing with law enforcement officers trying to close a door. He recorded the protesters yelling "You should be joining us! You're a police officer, you should be on our side."  He joined in the chant for the officers to join the protest.  At one point he was standing a few feet away from the entrance when one Officer in the back reached over the Officers in the front as the crowd was pushing

towards the door and pepper sprayed Mr. Tew directly in his face.  As he recorded it Mr. Tew said calmly "I have no choice, they're pushing me. I'm pushing away I promise. Don't, Don't, Don't" At which point they pepper sprayed him directly in the face again.

Mr. Tew attended to his injuries for 20 minutes or so, and then decided to return to the hotel due to the temperature dropping.

b. <u>History and Personal Characteristics</u>.

Mr. Tew was born in October of 1982 to a working-class family and raised by happily married parents in a household with five kids. Mr. Tew grew up camping in the mountains of Idaho, riding dirt motorcycles, snowmobiles, hunting, boating, playing all sports including football, wrestling, baseball, and soccer. His father was a large part of his life in teaching him all those things. He was a football, baseball, and wrestling coach to him and his 3 younger brothers. His father was a role model in every sense of the word. Two weeks after Christmas of 1997, when Mr. Tew was 15 years old, his father was killed in an avalanche while snowmobiling in the backcountry mountains of Idaho.

At 15, with three younger brothers, Mr. Tew lost his childhood and took on the role of surrogate father for his brothers, as well as providing support to his mother.  While still in high school Mr. Tew was essentially the head of the household, taking care of himself, his mother, and his brothers. His mother often worked 50-60 hours per week keeping a family construction business operating.  She still made it to his sporting events as he eventually got back to after taking time off while making adjustments at home.  Mr. Tew remembers a

habit developing of "telling" his mom what time he would be home rather than having to ask how late he could stay out.

Being the only other driver in the family while his mother worked, Mr. Tew took on all the tasks of transporting his younger siblings to their sports practices, picking them up or dropping them off at friends' homes, and once a week for the entirety of his time in high school he did the family's grocery shopping.

Mr. Tew wasn't perfect – evidenced by numerous driving infractions while in high school – but he had good grades, was an accomplished football player, and took second place in high school wrestling. He never stopped thinking about his future and enrolled in college at Utah State University with the goal of becoming a commercial airline pilot.

He enrolled in the Aviation Technology program and had a "minor" in Business Management. He started flying airplanes before his 19th birthday. Utah State's aviation program owed a fleet of aircraft used by student pilots which he would use to do all his flight training in addition to carrying a course load of 16-18 credits per semester.  After getting some financial assistance from his mother his first year, after that he worked full time to pay his bills.  He spent his summers earning money as a "hot shot" wildland fire fighter for both the U.S. Forest Service and Bureau of Land Management, sometimes working 14-16 days straight,12-16 hours per day on the fire line.  The work was rewarding and the pay was significant.  He was able to graduate on time with and obtained all all the pilot ratings he needed to enter the field to become a commercial airline pilot.

He moved to Kingman, Arizona where the weather allowed him to work as a flight instructor year-round.  In addition to getting paid, that job allowed Mr. Tew to accumulate the 1500 hours of light time required at be hired at a commercial airline. He worked hard and flew 6 days a week for an entire year and was able to start his professional aviation career at Skywest Airlines in May of 2007, almost exactly one year after graduating college. He then moved back to Idaho where began to settle down his life.  Now married, he and his wife bought their first home, and had their first child in 2010.

He spent more than 12 with Skywest, almost five as a Captain. He had a perfect aviation record and never failed an annual "check-ride," the yearly pilot exam required by the FAA. He became one of less than 10% at his company to be qualified to fly into Aspen/Eagle Colorado, "Special Qualification" airport that required weeks of simulator training and testing because the elevation made it a very difficult airport to fly into and out of.  Skywest is the only commercial airline that is qualified to fly into Aspen, and only 10% of Skywest pilots had the required qualifications to do so.

Mr. Tew and his first wife divorced, but they have an amicable relationship and continue to co-parent their two children.   Mr. Tew remarried and now lives in Arizona where she resided when they met.  He worked for Skywest until 2019 when he decided to move to a larger airline company that provided a better quality of life be being home every day, and earning more long-term. Allegiant Airlines flies "day trips" where the pilots do a single round trip each day rather than multi-day travel with overnights in distant cities. While at Skywest Mr. Tew had spent many weekends, holidays, birthdays,

anniversaries, and other significant events in random hotels while on work travel.

Mr. Tew believed he would work the rest of his career for Allegiant but had his commercial airline pilot's license suspended by TSA and the FAA after his arrest in this case – notwithstanding the fact that he was charged only with misdemeanors.  The FBI has labeled his file as a "domestic terrorism" case, and TSA has declared him ineligible to go into secured locations at commercial airports.  Mr. Tew is contesting these decisions but is uncertain at this point whether he will ever be allowed to resume his career as a commercial airline pilot.

Without any time in custody, Mr. Tew has already suffered severe punishment in that he may have lost a career he has spent more than a decade building.

    2.    The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other <u>correctional treatment in the most effective manner</u>.

This Court, as a matter of justice and equity, should treat Defendant Tew no different than other misdemeanant offenders convicted in connection with the riot at the Capitol on January 6. He entered the building without express authorization at a time they were not lawfully permitted to do so, and during a time when United States Capitol building and surrounding grounds were closed to the public.

But Mr. Tew engaged in no acts of violence.  He did not engage with any law enforcement officers, and he did not engage in any destruction of property.

Given Defendant Tew's actual conduct on January 6, the sentence of probation recommended by the Probation Officer is the most reasonable response from this Court to address the nature of the nature of the criminal acts which he has admitted. Anything beyond that is unnecessarily punitive, particularly in light of the collateral consequences that the federal government might be forcing upon him that will terminate his career.

Other Judges of this Court have acknowledged that such sentences are appropriate in substantially similar cases. United States v. Wiesmar, 21-cr-00592-1, United States v. Frankowski, 21-cr-00592-2, United States v. Cronin, 21-cr- 00233. In each of those cases the Government asked for a term of incarceration, but the Court determined that such a sentence was not warranted by the facts and that a sentence of probation was sufficient to accomplish the Sec. 3553(a) policy goals.

The Defendants in Wiesmar and Frankowski are similar to Mr. Tew – and likely did even more than Mr. Tew while inside the Capitol. They entered the Capitol building following the crowd just as Defendant Tew, but then traveled to different locations while inside the building and spent more time inside. Wiesemar and Frankowski both entered two Senate offices and spent several minutes inside each. Similar to Mr. Tew, they caused no damage to the building nor engaged in any violence.

Cronin is also similarly situated to Mr. Tew. He entered the building, met up with his codefendants, and the group made its way towards the Senate side

14

of the Capitol. After being in the building for a short time, Cronin exited the building the same route he entered. Again, like Mr. Tew, after entering Cronin spent some time traveling through the halls before exiting the building causing no damage nor engage in violence.

Further, this Court should also recognize the sentence handed down by District Judge Mehta in United States v. Greene, 21-cr-00028. Defendant Greene went to trial, was acquitted of four felonies but found guilty by a jury on a Class "A" misdemeanor – he did not plead guilty and maintained his innocence even at sentencing. Nevertheless, Judge Mehta found it proper to sentence Greene to only two years of probation based on the totality of the evidence heard at trial.

DEFENDANT'S SENTENCING RECOMMENDATION

Based on specific offense conduct here, and taking into consideration all the factors set forth by Congress in Section 3553(a), a sentence of probation lasting no more than two years for Mr. Tew accomplishes the purposes of Section 3553(a) and is a sentence with respect adequately addresses the seriousness of the offense involved, and promotes future respect for and adherence to the law not only by them but by the public at large as well.

Date: October 4, 2023                           Respectfully Submitted,

                                                /s/ William L. Shipley
                                                William L. Shipley
                                                PO Box 745
                                                Kailua, Hawaii 96734

Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

*Attorney for Defendants*